No. 24-2918

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

JOSEPH LOCHUCH EWALAN,

*Plaintiff-Appellant,*

v.

WASHINGTON DEPARTMENT OF CORRECTIONS; SERGEANT ROTHWELL, SERGEANT DICKERSON, CC2 COUNSELOR NIKULA, H2 WAKEFIELD, ROBERT SCHRIEBER, and STAFFORD CREEK CORRECTIONS CENTER

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Western District of Washington
No. 3:20-cv-05678-JLR
Hon. James L. Robart, District Judge

## APPELLANT'S SUBSTITUTE OPENING BRIEF

Michael J. Stortz
Taylor Yamahata
K&L GATES LLP
Four Embarcadero Center Suite 1200
San Francisco, California 94111
Telephone: 415-882-8200
Michael.Stortz@klgates.com
Taylor.Yamahata@klgates.com

Tre A. Holloway
Neeki Memarzadeh
K&L GATES LLP
1601 K Street NW
Washington, DC 20006
Telephone: 202-778-9000
Tre.Holloway@klgates.com
Neeki.Memarzadeh@klgates.com

*Attorneys for Appellant*

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ..................................................... 3

STATEMENT OF ISSUES .................................................................. 3

STATEMENT OF THE CASE.............................................................. 4

I.     Mr. Ewalan's Allegations of the July 2017 and October 2019 Assaults ..................................................................................... 4

II.    Procedural History........................................................................ 5

    A.    Summary Judgment .......................................................... 6

    B.    Trial ................................................................................... 8

    C.    Opening Statements .......................................................... 9

    D.    Mr. Ewalan's Case-in-Chief ........................................... 10

        1.    Mr. Ewalan's Testimony ....................................... 10

        2.    Mr. Ewalan's Medical Witnesses .......................... 13

    E.    The Defense Case............................................................. 15

    F.    Closing Statements........................................................... 18

    G.    Mr. Ewalan's Repeated Motions for Appointment of Counsel............................................................................. 22

        1.    Three Motions Denied ............................................ 22

        2.    Sua Sponte Reconsideration and Conditional Appointment of Pro Bono Counsel ............................ 24

        3.    Mr. Ewalan's Request to Replace Appointed Counsel and the Court's Catch-22 Reasoning.............. 25

i

H.     Verdict and Appeal ............................................................. 26

SUMMARY OF THE ARGUMENT .................................................... 27

STANDARD OF REVIEW ................................................................. 28

ARGUMENT ....................................................................................... 29

I.     Mr. Ewalan Should Have Been Appointed Counsel When Properly Applying the Factors Under *Wilborn* ................................ 29

A.     Mr. Ewalan Showed a Sufficient Likelihood of Success on the Merits ........................................................... 31

B.     Mr. Ewalan's Could Not Sufficiently Articulate His Claims ....................................................................... 32

1.     Cognitive and Emotional Barriers Undermined Mr. Ewalan's Ability to Articulate His Claims ............ 33

2.     Complex Legal and Factual Issues Required Advocacy Beyond Mr. Ewalan's Abilities .................. 34

3.     Structural Barriers Further Impeded Mr. Ewalan's Ability to Articulate His Claims ................................. 37

4.     The District Court's Denial of Replacement Counsel Ignored Its Own Prior Findings and Inconsistently Applied the Standard, Resulting in Prejudicial Error ............................................................ 39

C.     The Ninth Circuit's Standard Warrants Clarification or Reconsideration ....................................................... 41

CONCLUSION .................................................................................... 46

# TABLE OF AUTHORITIES

*Page(s)*

*Cases*

*Abdullah v. Gunter*,
 949 F.2d 1032 (8th Cir. 1991) ............................................................39

*Agyeman v. Corrections Corp. of Am.*,
 390 F.3d 1101 (9th Cir. 2004) .....................................................24, 37

*Am. Beverage Ass'n v. City & Cty. of San Francisco*,
 871 F.3d 884 (9th Cir. 2017) ..............................................................29

*Branch v. Cole*,
 686 F.2d 264 (5th Cir. 1982) .......................................................42, 43

*Chang v. United States*,
 327 F.3d 911 (9th Cir. 2003) ..............................................................28

*Cole v. Janssen Pharms, Inc.*,
 265 F. Supp. 3d 892 (E.D. Wis. 2017) ...............................................44

*Duncan v. Duckworth*,
 644 F.2d 653 (7th Cir. 1981) ..............................................................44

*Eagan v. Dempsey*,
 987 F.3d 667 (7th Cir. 2021) ..............................................................33

*Hampton v. California*,
 83 F.4th 754 (9th Cir. 2023) ...............................................................34

*Hodge v. Police Officers*,
 802 F.2d 58 (2d Cir. 1986) ..........................................................42, 43

*James v. Eli*,
 889 F.3d 320 (7th Cir. 2018) ..............................................................35

*Jenkins v. Woodard*,
 109 F.4th 242 (4th Cir. 2024) .............................................................33

*Latham v. Pollard,*
No. 3:20-cv-02177, 2024 WL 3367529 (S.D. Cal. July 10, 2024) ....................31

*Lavado v. Keohane,*
992 F.2d 601 (6th Cir. 1993) .................................................................43

*Lemire v. California Dep't of Corr. & Rehab.,*
726 F.3d 1062 (9th Cir. 2013) ...............................................................35

*Mallard v. U.S. Dist. Ct. for S. Dist. of Iowa,*
490 U.S. 296 (1989)..........................................................................29, 45

*McKeever v. Israel,*
689 F.2d 1315 (7th Cir. 1982) ...............................................................23

*Merritt v. Faulkner,*
697 F.2d 761 (7th Cir. 1983) .................................................................35

*Nwandu v. Bach,*
513 F.App'x 642 (9th Cir. 2013) ...........................................................26

*Ogan v. Spokane Cnty. Jail,*
No. cv-06-317, 2008 WL 238608 (E.D. Wash. Jan. 28, 2008) ..........................31

*Palmer v. Valdez,*
560 F.3d 965 (9th Cir. 2009) .................................................................26

*Parker v. Carpenter,*
978 F.2d 190 (5th Cir. 1992) .................................................................44

*Pruitt v. Mote,*
503 F.3d 647 (7th Cir. 2007) .......................................................33, 35, 43

*Rayes v. Johnson,*
969 F.2d 700 (8th Cir. 1992) ...........................................................43, 44

*Ricks v. Khan,*
135 F.4th 296 (5th Cir. 2025) ...............................................................36

*Sanchez v. Chapman,*
352 F. App'x 955 (5th Cir. 2009)...........................................................33

iv

*Santiago v. Walls*,
　599 F.3d 749 (7th Cir. 2010) ...................................................................36

*Swofford v. Mandrell*,
　969 F.2d 547 (7th Cir. 1992) ...................................................................35

*Tabron v. Grace*,
　6 F.3d 147 (3d Cir. 1993) .................................................................41, 43

*Tai Huynh v. Callison*,
　700 F. App'x 637 (9th Cir. 2017) ...........................................................36

*Terrell v. Brewer*,
　935 F.2d 1015 (9th Cir. 1991) .................................................................24

*Tilei v. McGuinness*,
　642 F. App'x 719 (9th Cir. 2016) ...............................................33, 35, 36

*Vilchez v. Holder*,
　682 F.3d 1195 (9th Cir. 2012) .................................................................37

*Walker v. Price*,
　900 F.3d 933 (7th Cir. 2018) ...............................................34, 37, 40

*Weller v. Dickson*,
　314 F.2d 598 (9th Cir. 1963) .................................................................29

*Wilborn v. Escalderon*,
　789 F.2d 1328 (9th Cir. 1986) .................. 2, 3, 23, 27, 28, 29, 30, 32, 42

*Wilk v. Neven*,
　956 F.3d 1143 (9th Cir. 2020) .................................................................34

*Wilkerson v. Wheeler*,
　772 F.3d 834 (9th Cir. 2014) .................................................................28

*Wood v. Idaho Dep't of Corr.*,
　391 F. Supp. 2d 852 (D. Idaho 2005) ...................................................34

*Wright v. Dir. of Corr.*,
　443 F. App'x 289 (9th Cir. 2011) .....................................................31, 32

v

**Statutes**

28 U.S.C. § 1291 ..................................................................................3

28 U.S.C. § 1331 ..................................................................................3

28 U.S.C. § 1915 ............................................................................29, 30

28 U.S.C. § 1915(e)(1)........................................2, 22, 28, 29, 45

42 U.S.C. § 1983 ....................................................4, 5, 6, 42

**Rules**

Fed. R. Civ. P. 50(a)........................................................15, 40

**Other Authorities**

Howard B. Eisenberg, *Rethinking Prisoner Civil Rights Cases and the Provision of Counsel*, 7 S. ILL. U. L.J. 417 (1993) .............................................44

Kimberly A. Owens, *Right to Counsel – The Third Circuit Delivers Indigent Civil Litigants from Exceptional Circumstances*, 39 VILL. L. REV. 1163 (1994)..........................................................44

## INTRODUCTION

This appeal concerns the district court's decision to revoke its own appointment of pro bono counsel for Joseph Lochuch Ewalan. Mr. Ewalan is a Kenyan-born, incarcerated civil rights plaintiff. He suffers from a traumatic brain injury and speaks with a pronounced accent. Just months before trial, and without any evidentiary hearing or reasoned explanation, the district court rescinded its appointment of counsel. This decision came after the court had already concluded that the complexity of the case and Mr. Ewalan's impairments warranted appointed representation.

When Mr. Ewalan reported that appointed counsel was not communicating with him or preparing for trial, he asked the court to appoint someone new. Rather than requesting that substitute counsel represent Mr. Ewalan, the court reversed its prior finding and stated—without analysis—that Mr. Ewalan appeared capable of representing himself.

That left Mr. Ewalan to try a medically and legally complex case alone, by video, from prison. He had no lawyer to help qualify expert witnesses, present exhibits, or cross-examine the defendants. He could not see the jury until closing argument, and the jury never saw him in person. One juror later said they "didn't understand hardly a word" he said.

1

The result was a structurally tilted proceeding. Mr. Ewalan alleged that prison officials failed to protect him from assaults—one of which caused the very brain injury that impaired his ability to litigate. Yet to prevail on that claim, he had to function as though he had no such impairment. The district court reasoned that he had shown the ability to pursue his claims on his own, but that conclusion directly contradicted the court's earlier determination that the case was too complex, and Mr. Ewalan too impaired, to proceed without a lawyer. In the end, he was left to navigate a jury trial alone, despite having previously persuaded the court that appointed counsel was necessary to ensure a fair trial.

This appeal challenges the district court's decision not to renew its request for volunteer counsel under 28 U.S.C. § 1915(e)(1) after the attorney initially appointed withdrew. The court's ruling departed from its own prior findings, failed to engage with the legal standard set out in *Wilborn v. Escalderon*, 789 F.2d 1328 (9th Cir. 1986), and gave no reasoned basis for concluding that the same "exceptional circumstances" no longer applied. Because both prongs of the *Wilborn* test—likelihood of success and inability to articulate claims—were satisfied, the court abused its discretion in requiring Mr. Ewalan to proceed to trial alone. This Court should vacate the judgment and remand for a new trial, with instructions that the district court reinstate its earlier order requesting the appointment of counsel.

2

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. The district court's orders denying the appointment of counsel were non-appealable interlocutory orders that became reviewable upon entry of final judgment on April 25, 2024. 1-ER-2–3. Plaintiff filed a timely notice of appeal on May 3, 2024, 6-ER-822–871. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether the district court erred in denying Mr. Ewalan's request for appointment of substitute counsel, where (a) Mr. Ewalan had successfully defeated summary judgment, demonstrating the viability of his claims, and (b) he faced profound barriers to articulating those claims at trial, including a traumatic brain injury, PTSD, limited access to legal resources as an incarcerated litigant, lack of ability to cross-examine key witnesses, and the constraints of participating remotely via video conferencing while the defendants and jury were physically present in the courtroom.

2. Whether the panel should note that the "exceptional circumstances" test for appointment of counsel under *Wilborn v. Escalderon*, 789 F.2d 1328 (9th Cir. 1986), may warrant en banc reconsideration or clarification, particularly in light of mounting criticism within and outside this Circuit, its growing divergence from other

circuits' approaches, and its failure to account for the real-world barriers faced by incarcerated, pro se plaintiffs.

## STATEMENT OF THE CASE

Joseph Lochuch Ewalan, an incarcerated pro se litigant, brought this action under 42 U.S.C. § 1983, alleging deliberate indifference by prison officials to his safety and medical needs. His case unfolded in a trial marked by procedural irregularities that undermined his ability to present his claims.

## I.    Mr. Ewalan's Allegations of the July 2017 and October 2019 Assaults

Mr. Ewalan's troubles began after a May 22, 2017, surgery to remove a neck tumor. 2-ER-111. He was soon placed in a cell with another inmate who, fearing Mr. Ewalan had cancer, did not want to share the cell. 2-ER-111. By July 2017, tensions had escalated. 2-ER-112. Mr. Ewalan testified that he reported threats and assaults to Defendants Schreiber, Rothwell, and Dickerson in July 2017, pleading for protection because he could not defend himself while recovering from surgery. 2-ER-112–113. According to Mr. Ewalan, his reports were dismissed as "baseless." 2-ER-112. Mr. Ewalan recounted asking the "why they did not protect me," but he "never got an answer from them." 2-ER-159–160.

4

On July 16, 2017, Mr. Ewalan was found unconscious in his cell, bleeding from the head. 4-ER-478. He was rushed to the hospital unconscious, suffering from an eye injury, a cheekbone fracture, and other injuries. 2-ER-153–154. He sustained a traumatic brain injury that ultimately required surgery to relieve a brain bleed. 2-ER-115–116; 2-ER-156–158. He described resulting ongoing symptoms that continue to affect him: headaches, anxiety, and bad dreams replaying the assault. 2-ER-179.

In October 2019, Mr. Ewalan was again assaulted by a cellmate, after Defendants Larsen and Wakefield denied his request to be moved due to threats. 2-ER-118–119.

## II. Procedural History

Mr. Ewalan filed suit in the United States District Court for the Western District of Washington, alleging that the Washington State Department of Corrections and several individual officers violated his constitutional rights under the Eighth Amendment and 42 U.S.C. § 1983 by failing to protect him from known threats of assault and by denying him adequate medical care following those assaults. 6-ER-803–821. Wakefield,[1] and others acted with deliberate indifference

---

[1] At the close of Mr. Ewalan's case-in-chief, the court dismissed Defendants Larsen and Wakefield, concluding that Mr. Ewalan had not presented sufficient evidence against them. 3-ER-273–274.

to his safety by ignoring his repeated reports of threats and refusing to transfer him to a safer location, leading to assaults by fellow inmates in July 2017 and October 2019.[2] At the outset of the case, Mr. Ewalan also filed a motion for appointment of counsel, 4-ER-527–545., which the magistrate judge denied. 1-ER-25–29. *See infra* Section II.G.1. The magistrate judge subsequently recommended granting summary judgment in full for Defendants. *See* 4-ER-459–472.

### A.    Summary Judgment

The district court partially reversed the grant of summary judgment, allowing several claims to proceed to trial, 4-ER-474–475, and initially denied Mr. Ewalan's renewed request for appointment of counsel, *see infra* Section II.G.1. The court dismissed the Washington State Department of Corrections and Stafford Creek Corrections Center, holding that they were immune from suit under § 1983. 4-ER-463–464. With respect to the failure-to-protect claims, the court granted summary judgment for Defendant Tammy Nikula on Count I, finding no evidence that she had subjective awareness of a risk to Mr. Ewalan before the July 2017 assault. 4-ER-465.

---

[2] Mr. Ewalan also alleged that the defendants failed to provide appropriate medical care for the serious injuries he sustained, 4-ER-541–542, but he later withdrew that claim. 4-ER-457 at n.3.

The court denied summary judgment as to Defendants Robert Schreiber and Arlee Rothwell on Count I, concluding that there were disputed issues of fact as to whether they were deliberately indifferent to a substantial risk of harm. 4-ER-470. The court also denied summary judgment as to Defendants Kendra Wakefield and Denny Larsen on Count II, finding a genuine dispute of material fact regarding whether they were subjectively aware of a risk to Mr. Ewalan before the October 2019 assault. 4-ER-470.

The court denied Defendants' motion for summary judgment based on qualified immunity, holding that, viewing the facts in the light most favorable to Mr. Ewalan, Defendants' alleged inaction in the face of known threats could amount to deliberate indifference in violation of clearly established law. 4-ER-470–472.

Later, at the close of summary judgment, the district judge sua sponte reconsidered the issue of counsel and conditionally granted Mr. Ewalan's third motion, contingent on the identification of pro bono counsel willing to represent him. 1-ER-10–11; *see infra* Section II.G.2. After Mr. Ewalan explained that the attorney-client relationship had broken down and that he would be unable to proceed with appointed counsel, the district court granted counsel's motion to withdraw and denied Mr. Ewalan's renewed request for appointment of new pro bono counsel, leaving him to proceed to trial alone. 1-ER-4–5; *see infra* Section II.G.3.

7

## B. Trial

The trial opened with Mr. Ewalan alone, in spite of his numerous requests for pro bono counsel, appearing on a screen from prison, while the state's attorneys and defendants were seated together at the defense table in the courtroom. 2-ER-32, 121. The room was physically divided: the government's lawyers and their clients on one side of the courtroom, while Mr. Ewalan, the only plaintiff, was visible only through a video feed. 2-ER-101. He was not in the room to see the jury, nor could the jury see him in person—just a face on a screen, separated by distance and technology. Mr. Ewalan raised concerns about this setup, explaining that the Department of Corrections had not adjusted the camera, preventing him from seeing the jurors and preventing them from seeing him. He told the court that this lack of visibility was unfair and prejudiced his ability to assess the jury's reactions and demeanor during the trial. 2-ER-168.

Throughout the trial, it was defense counsel—not Mr. Ewalan—who physically showed the jury the evidence, with the court directing that all exhibits be routed through the defense table for presentation. 2-ER-142, 162. The court described defense counsel's role as akin to a "traffic cop," explaining that Mr. Rachel, seated in the courtroom with access to a computer, was responsible for pulling up exhibits at the court's instruction. 2-ER-174. The judge dismissed Mr. Ewalan's concerns that the defense was selectively controlling the evidence shown

8

to the jury. 2-ER-174. This setup left Mr. Ewalan reliant on his adversaries in the case—to physically manage the presentation of his own exhibits to the jury.

### C.     Opening Statements

In his opening statement, Mr. Ewalan described the lasting impact of the assaults he endured while incarcerated: headaches, dizziness, vomiting, difficulty concentrating, and limited mobility. 2-ER-117. He told the jury that these injuries prevented him from working, playing with his children, and living a normal life. 2-ER-117. Mr. Ewalan also stated that he reported threats and assaults to multiple prison staff members, including Defendants Schreiber, Rothwell, and Dickerson, but his pleas for protection were ignored. 2-ER-113.

Defense counsel opened by framing the case in sweeping generalizations about incarcerated individuals, telling the jury: "The residential population of a prison is, by definition, 100 percent criminal," (2-ER-120) and referring to the "criminality of a prison population." 2-ER-120. The defense attorney claimed that Mr. Ewalan failed to report any threats or safety concerns about his cellmates through the prison's grievance process before either the December 2017 or October 2019 incidents. 2-ER-122–124. He argued that no documentation existed to corroborate Mr. Ewalan's account, suggesting that any reports Mr. Ewalan made would have been documented had they occurred. 2-ER-124.

Outside the presence of the jury, Mr. Ewalan objected to the defense attorney's inflammatory rhetoric, arguing that labeling him a "criminal" was misleading and prejudicial. 2-ER-128. The court largely dismissed the concern and declined to instruct the defense attorney to avoid the term "criminal" when referring to Mr. Ewalan. 2-ER-129. Of course, in this proceeding, Mr. Ewalan was a civil plaintiff, not a criminal defendant. 2-ER-41.

### D.     Mr. Ewalan's Case-in-Chief

On the second day of trial, an error in the subpoena schedule resulted in Mr. Ewalan's witness not being present, forcing him to take the stand as his own first witness. 2-ER-136. Caught off guard and without the benefit of legal counsel, Mr. Ewalan expressed his confusion, telling the court: "I would like the jury to hear that -- um, I'm confused a little bit, Your Honor -- I'm sorry -- because am I supposed to -- this is, kind of -- because I don't have somebody, an attorney to ask me questions directly, and maybe that's why I'm getting a little bit confused." 2-ER-138.

### 1.     Mr. Ewalan's Testimony

As Mr. Ewalan began his direct testimony, the court repeatedly interrupted him, requiring him to provide precise "Bates numbers" and legal foundations for each exhibit. 2-ER-140–142. Attempting to show the jury color photographs of his injuries, Mr. Ewalan was told that the court had only received black-and-white

10

copies. 2-ER-142–143. When one of the photos appeared in black and white, he objected, explaining that the color version was necessary for the jury to fully understand the extent of his injuries. 2-ER-143. The court overruled the objection, stating that the black-and-white copy was the exhibit submitted by Mr. Ewalan and that he could not substitute it with a color copy during his testimony. 2-ER-143. Mr. Ewalan then continued with his testimony, presenting his testimony using the black-and-white photographs, and explaining to the jury, "[B]ecause the photo is black and white, you can't really see the blood, but if you are to see the colored ones, it will be very, very different." 2-ER-144.

As Mr. Ewalan tried to walk the jury through the photographs of him lying bloodied on the floor of his cell, he lost his composure and requested a break. 2-ER-146. When testimony resumed, Mr. Ewalan explained that he had reported threats to Defendant Russell and referred to his diary as contemporaneous documentation. 2-ER-147. Mr. Ewalan attempted to introduce diary entries from July 2017 as evidence, arguing they fell under the business records exception to the hearsay rule. 2-ER-148–151. The court ultimately sided with the defense: it excluded one entry as incomplete and misleading, while allowing the other. 2-ER-151.

Mr. Ewalan then moved to admit medical records from Grays Harbor Hospital as evidence. The court sustained another defense objection, explaining to the jury

11

that because Mr. Ewalan was not the author of the hospital records, and was offering them to prove the truth of what they said, the documents were inadmissible hearsay. 2-ER-155.

When Mr. Ewalan tried to explain how he repeatedly reported the threats to the defendants—a key issue of fact in proving deliberate indifference—the court and defense counsel repeatedly curtailed his testimony. 2-ER-139, 140, 147, 160, and 166. Defense counsel objected, and the court sustained the objection, instructing Mr. Ewalan not to speculate about the Defendants' responses. 2-ER-159. Mr. Ewalan persisted: "Every time I asked that question, I have never --." 2-ER-160. Mr. Ewalan tried to continue: "The defendants tried to discredit me. Because if they don't trust me, I could not—" 2-ER-161. The court cut him off again, instructing him not to argue his case but to stick to the facts. 2-ER-161.

Mr. Ewalan later tried to admit a research article on traumatic brain injury and portions of interrogatory responses, but the court excluded both. 2-ER-163–164. He then moved to admit his mental health records as evidence. 2-ER-179. The court permitted him to enter only a single page of the medical records. 2-ER-180. After briefly discussing a 2022 visit to a mental health provider, Mr. Ewalan attempted to testify about his medical treatment, but the court again cut him off, explaining that the doctor would have to testify for himself. 2-ER-180.

12

Without presenting evidence or testimony specific to the individual defendants or addressing the October 2019 assault—the subject of his lawsuit—Mr. Ewalan abruptly ended his testimony. 2-ER-182. When asked if he had more testimony to present, Mr. Ewalan responded that he did not have anything else "right now" and said he would wait to cross-examine the defendants, suggesting that he did not understand that resting his case meant he would have no further opportunity to present evidence. 2-ER-182. On cross-examination, when Mr. Ewalan tried to elaborate on an answer, he appeared to expect an opportunity to discuss reports to other officers, but the court cut him off, explaining that redirect was limited to addressing only the specific question asked by defense counsel. 2-ER-185. Mr. Ewalan would later explain, after closing his case-in-chief, that he believed he would have the chance to continue presenting his case through cross-examination of the defense's witnesses. 3-ER-278.

### 2.    Mr. Ewalan's Medical Witnesses

With direct examination complete, Mr. Ewalan moved to call Dr. Strick, a board-certified infectious disease and internal medicine physician, seeking to introduce evidence that would help the jury understand the medical facts of his case, including his injuries, his treatment, and their impact. 2-ER-189. Mr. Ewalan asked Dr. Strick about her medical training, her role as his treating physician, and her

13

familiarity with his injuries, but the examination once again quickly became bogged down by procedural interruptions. 2-ER-192, 193–194. The court repeatedly reminded Mr. Ewalan that he could not "lead" a "friendly witness," explaining to the jury that leading questions were only permitted on cross-examination. 2-ER-198.

Dr. Strick described the enduring symptoms Mr. Ewalan experienced: headaches, nausea, and vomiting—"indicators that the brain is unwell"—but much of the supporting documentation for her testimony was excluded on technical grounds. 2-ER-204. As Dr. Strick testified about her treatment of Mr. Ewalan—including a fracture to his cheekbone, facial lacerations requiring stitches, and a brain injury involving a 10-millimeter midline shift—the court routinely cut off lines of questioning, citing lack of foundation and hearsay. 2-ER-193, 196, 199–200. For example, when Mr. Ewalan moved to admit a medical record, the court told him, "You have to move the admission of an exhibit. You just mentioning it doesn't mean you're moving to admit it." 2-ER-193. When he tried to lay foundation for the same exhibit, the court pressed for more details: "Where did this exhibit come from? Who is the author? 2-ER-199. When Mr. Ewalan asked Dr. Strick whether his brain injury was caused by the assault, the court ruled that such an opinion would require Dr. Strick to qualify as an expert witness, which Mr. Ewalan had not done. 2-ER-201–202.

14

Mr. Ewalan then called Chad Anderson, a psychology associate at the Department of Corrections, Mr. Anderson testified that he had diagnosed Mr. Ewalan with PTSD based on reports of assaults and observed symptoms such as nightmares, hypervigilance, and distressing memories. 3-ER-251.

### E. The Defense Case

The defense's case began before Mr. Ewalan had formally rested his own. At the close of Mr. Ewalan's second witness, Dr. Strick, the court permitted the defense to present its first witness, who Mr. Ewalan was required to cross-examine before concluding his own case. 2-ER-205–206, 215. The following day, after cross-examining this defense witness and presenting his final witness, Mr. Ewalan was declared to have rested his case. 3-ER-258. The court then immediately proceeded to consider the defense's Rule 50(a) motion, even though the boundaries between the plaintiff's and defense cases had been blurred by the midstream presentation of defense evidence. 3-ER-273–279. The record does not indicate whether jurors understood the division between the two cases.

The defense case began with the testimony of Sgt. Arlee D. Rothwell, a key-control sergeant at Stafford Creek Corrections Center, where he had worked for 25 years. 2-ER-206–207. Rothwell testified that he did not recall any specific conversations with Mr. Ewalan about safety concerns in 2017 and that he had not

15

found any record in OMNI, the prison's electronic system for documenting staff-inmate interactions and behavior, that would indicate Mr. Ewalan had reported threats or safety risks. 2-ER-210, 214.

The defense then called Russell Dickerson, a retired sergeant at Stafford Creek Corrections Center, who also testified that he did not recall any threats to Mr. Ewan's safety in 2017 and found no reports of the threats in OMNI. 2-ER-230–237. On cross-examination, Mr. Ewalan pressed on whether Dickerson had checked surveillance footage or could recall specific incidents, Dickerson repeatedly answered, "That's above my job description," "That's above my pay grade," "I don't know," or "I'm not aware." 3-ER-260, 264, 265, 267, 269, 270. When Mr. Ewalan tried to establish whether there were records of the July 2017 assault, Dickerson responded: "Not that I'm aware of." 3-ER-261.

The defense then called Defendant Schreiber, a correctional unit supervisor. 3-ER-281, 283. Schreiber also stated that "I do not recall having a conversation" with Mr. Ewalan about his safety threats, and claimed no memory of safety concerns. 3-ER-286. Schreiber admitted that training on OMNI, the prison's incident logging system, was limited, mostly "learn as we go." 3-ER-290. His recollection of 2017 events was hazy: "That was quite a time ago, and I don't recall." 3-ER-286–287. On cross-examination, Mr. Ewalan asked whether Schreiber had found a report in

16

OMNI for the July 16, 2017 incident. 3-ER-293. Schreiber said yes, but only an infraction report with no photos, incident report, or statements. 3-ER-293. Ewalan pressed further—"Did you review anything about the incident? Did you ever ask?"—and Schreiber replied no to both. 3-ER-293. The court interjected repeatedly to tell Mr. Ewalan to stop "testifying," to "ask questions," and to "ask one thing at a time." 3-ER-294, 297.

The defense called two final witnesses: a records custodian to introduce Mr. Ewalan's medical report, and a resolution specialist for the Washington Department of Corrections, who testified about the DOC grievance process and authenticated two of Mr. Ewalan's grievance forms, which the court admitted over his objections. 3-ER-324–327, 331–333, 335–336.

When examining Sgt. Dickerson, Mr. Ewalan's questions about policy and procedures drew frequent objections from the defense, which the court sustained. 3-ER-264–265, 270–271. At times, the court interrupted to explain procedural issues, instructing Mr. Ewalan: "Don't testify. You've already done that." 3-ER-266. Later, during a break in testimony of Sgt. Rothwell, Mr. Ewalan asked to recall Defendant Rothwell, saying, "I have a few questions for him." 3-ER-244. The court shut this down immediately: "Mr. Rothwell has completed his examination, and you don't have a right to call him." 3-ER-244.

17

When cross-examining Sgt. Schreiber, Mr. Ewalan tried to admit into evidence letters he said he sent to the Department of Corrections, the court sustained objections for lack of foundation and improper testimony, telling Mr. Ewalan he needed to ask the witness if he had seen or was involved in the documents. 3-ER-300–301. The court ultimately denied admission, stating Schreiber had "no connection" to the exhibits. 3-ER-301. Throughout the trial, the court sustained multiple objections, cutting off questions as "argumentative" or "calls for speculation," including lines about video surveillance, classification practices, and safety protocols. 3-ER-270, 299.

### F.    Closing Statements

In his closing argument, Mr. Ewalan attempted to walk the jury through the evidence, summarizing his testimony and emphasizing that he had reported threats of assault to multiple prison officials before the July 2017 attack. 3-ER-371. He described the pain and lasting impact of his injuries, asserting that the defendants' failure to protect him violated the Eighth Amendment. 3-ER-374.

As he spoke, the court interrupted to correct perceived misstatements of the law or mischaracterizations of the evidence, reminding the jury that "your memory of the evidence controls, not what the lawyers say." 3-ER-373. After Mr. Ewalan concluded, the court punctuated the moment by telling the jury that Mr. Ewalan had

18

misstated the burden of proof, insisting that the defendants bore no such burden because they had not asserted affirmative defenses, an inaccurate statement that the court later corrected outside the jury's presence. 3-ER-389–390.

After Mr. Ewalan concluded his closing argument, defense counsel responded by emphasizing procedural shortcomings and seeking to cast doubt on the credibility of his claims. 3-ER-390–391. Defense counsel characterized the trial as confusing and suggested that the jury may have felt the same way, telling them: "If you have spent much of the past few days confused, scratching your heads, that's understandable. It just doesn't really add up." 3-ER-390.

Defense counsel repeatedly pointed out procedural missteps in Mr. Ewalan's presentation of his case. 3-ER-391. He told the jury that, while Mr. Ewalan had described a timeline in his opening statement, "that was not evidence," and emphasized: "Trying to [testify]... wasn't actually testimony, because it wasn't sworn." 3-ER-391.

Defense counsel argued that, although Mr. Ewalan was "hurt" in the July 2017 assault and there were photographs showing his injuries, "there is no sandwich, no valid legal claim here." 3-ER-395. He told the jury that Dr. Strick, the treating physician, "can't help him in this lawsuit" because she was not allowed to testify about causation for the November 2017 brain injury. 3-ER-392–394. He also

questioned the diary entries Mr. Ewalan referenced, stating that if they were meant to "refresh his memory... why is his story still lacking so many important details?" 3-ER-395–396.

Counsel concluded by framing the legal standard as a "heavy burden" and arguing that the defendants could not be held liable because they were not subjectively aware that Mr. Ewalan faced a "substantial risk of serious harm." 3-ER-397. He told the jury: "Follow the evidence and find that Mr. Ewalan has failed in nearly all of his Monday promises. He cannot carry his heavy burden of proof." 3-ER-397.

During his rebuttal argument, Mr. Ewalan repeatedly struggled to articulate his case to the jury, expressing confusion, distraction, and difficulty staying focused due to emotional distress and the effects of PTSD. 3-ER-398. He told the jury, "I was emotional. As a human being and as a person dealing with PTSD, too, I was very distracted, and I was very confused." 3-ER-398. He explained that he forgot to present his case against two defendants during trial because of these challenges: "I totally forget that I was supposed to present my case to these two defendants, and I don't blame the court, I don't blame myself, because I know the issues I'm dealing with. I was very distracted. You all saw that." 3-ER-398. The court repeatedly

20

interrupted Mr. Ewalan, instructing him, "You need to stay to the facts that are in the record. You don't get to explain what's going on in your mind." 3-ER-398.

As Mr. Ewalan continued, the court cut him off again when he tried to explain background facts, stating, "Sir, stop. You're bringing up as-evidence material. Evidence is closed. You don't get to add additional facts." 3-ER-400–401. When Mr. Ewalan hesitated, unsure whether he had addressed certain facts in his testimony, the court stated, "Sir, you're adding facts that are not in the record. You had an opportunity to present your case. You talked about this. There are some things you didn't say. You now don't get to say, 'Oh, and this also happened.' That's not the way the trial system works." 3-ER-401.

Despite these interruptions, Mr. Ewalan attempted to summarize his position, telling the jury, "I want to remind you that, when I am in prison, I am in custody, they have a duty to protect me. I had a duty to report it when I feel that I'm in danger, and I did that, and therefore, I'm asking the members of the jury, just follow the evidence, just follow the facts, and follow the instructions that the court has instructed you, and I ask you to return a verdict of guilt against the defendants." 3-ER401–402.

### G.     Mr. Ewalan's Repeated Motions for Appointment of Counsel

Over the course of the litigation, Mr. Ewalan repeatedly sought the appointment of counsel, filing three separate motions under 28 U.S.C. § 1915(e)(1). 4-ER-525–526, 4-ER-494–518, 4-ER-454. The magistrate judge denied his requests twice, 1-ER-21–29, and the district judge initially denied a third request, 1-ER-20, then granted it sua sponte, 1-ER-15, before ultimately denying the renewed motion for appointment of pro bono counsel after his assigned attorney withdrew, 1-ER-4–9, which is the basis for Mr. Ewalan's appeal.

#### 1.     Three Motions Denied

Mr. Ewalan first requested the appointment of counsel at the outset of the case, filing a motion alongside his complaint. 4-ER-525–526. The magistrate judge denied this initial motion, reasoning that Mr. Ewalan had not demonstrated "exceptional circumstances" warranting the appointment of counsel under 28 U.S.C. § 1915(e)(1). 1-ER-27, 29. The magistrate judge opined that Mr. Ewalan's claims, alleging failure to protect and deliberate indifference, were not unusually complex, that he had not shown a likelihood of success on the merits, and that his filings to date demonstrated sufficient ability to articulate his claims pro se. 1-ER-28. The magistrate judge acknowledged that Mr. Ewalan mentioned a brain injury in some pleadings but

22

concluded that it did not establish a right to counsel because Mr. Ewalan had not presented evidence of his medical limitations. 1-ER-28.

During discovery, Mr. Ewalan renewed his request for counsel, citing the need to take depositions and obtain discovery from multiple witnesses. 4-ER-494–496. The magistrate judge again denied the motion, reasoning that the need for discovery assistance does not, on its own, establish the exceptional circumstances required for appointment of counsel. 1-ER-23–24.

After the magistrate judge recommended dismissing Mr. Ewalan's claims on summary judgment, Mr. Ewalan filed his third motion for appointment of counsel. 4-ER-454. The district judge denied the motion, reasoning that Mr. Ewalan's prior filings demonstrated an ability to articulate claims, present arguments, and litigate effectively pro se. 1-ER-18, 20. Additionally, the court noted that the case had not yet reached trial, and it could not assess the likelihood of success on the merits based solely on the survival of certain claims at the summary judgment stage. 1-ER-19. The court appeared to acknowledge a circuit split with the Seventh Circuit as illustrated in *McKeever v. Israel*, 689 F.2d 1315 (7th Cir. 1982) where the court applied a multi-factor test for appointment of counsel but nonetheless applied the stricter standard required by this Circuit's precedent in *Wilborn*. 1-ER-18. Applying

23

the *Wilborn* standard, the court concluded that Mr. Ewalan had not demonstrated exceptional circumstances and denied the appointment of counsel. 1-ER-13, 15.

### 2. Sua Sponte Reconsideration and Conditional Appointment of Pro Bono Counsel

Later, the district judge sua sponte reconsidered the issue of counsel and conditionally granted Mr. Ewalan's third motion, contingent on the identification of counsel willing to represent him. 1-ER-10–11. The court based its decision on Mr. Ewalan's "traumatic brain injury" and the "lasting impacts from the injury, which could have also impacted his cognitive capabilities." 1-ER-14. Citing this Court's decisions in *Agyeman v. Corrections Corp. of Am.*, 390 F.3d 1101, 1103 (9th Cir. 2004), and *Terrell v. Brewer*, 935 F.2d 1015, 1017 (9th Cir. 1991), the district court concluded that "exceptional circumstances" warranted appointment of counsel, in part because Mr. Ewalan's claims had survived summary judgment and would be resolved through trial or settlement, supporting a potential likelihood of success on the merits. 1-ER-14. The court reasoned that the presence of unresolved factual disputes and the prospect of trial weighed in favor of revisiting the prior decision. 1-ER-14. On February 16, 2023, the district court formally appointed pro bono counsel for Mr. Ewalan. 4-ER-452–453.

24

### 3.    Mr. Ewalan's Request to Replace Appointed Counsel and the Court's Catch-22 Reasoning

A few months into the representation, Mr. Ewalan filed a motion requesting that the court relieve his appointed counsel and assign a replacement, alleging a pattern of communication difficulties and breakdowns in the attorney-client relationship. 4-ER-440, 443. He stated that counsel did not reach out to him after being appointed and only spoke with him by phone after Mr. Ewalan initiated contact. 4-ER-443. According to Mr. Ewalan, during that initial phone conversation, he requested that counsel refile certain motions, and counsel declined to do so. 4-ER-443. Mr. Ewalan further alleged that he made multiple attempts to communicate with counsel through phone calls and letters but received limited responses and inconsistent follow-through. 4-ER-444. He expressed concern that counsel failed to mark legal mail properly, discussed case matters in a way that might have compromised privileged information, and did not provide copies of court filings or consult with him on case strategy. 4-ER-444–445. Mr. Ewalan emphasized that the lack of communication left him unaware of filings his counsel made on his behalf, and that scheduled calls often did not occur. 4-ER-446.

The district court denied Mr. Ewalan's request for the appointment of a new pro bono attorney. 1-ER-9. While the court had previously found that Mr. Ewalan's traumatic brain injury, combined with the legal questions to be resolved at trial,

25

constituted "exceptional circumstances" justifying the appointment of counsel, it concluded that "subsequent developments" had altered the analysis, without citing any evidence of changed circumstances regarding Mr. Ewalan's brain injury or capacity to litigate. 1-ER-8. Instead, the court focused on Mr. Ewalan's complaints about his appointed counsel, particularly that counsel refused to file motions Mr. Ewalan requested. The court interpreted this disagreement as evidence that Mr. Ewalan possessed "ample confidence" to represent himself (1-ER-8), relying on this unsupported conclusion to deny new counsel. The court cited no legal authority for the proposition that "confidence" alone suffices to justify denying appointment and failed to explain how Mr. Ewalan's disputes with counsel undermined the original "exceptional circumstances" finding. The court further pointed to Mr. Ewalan's success in defending his claims against summary judgment as evidence that he could proceed without counsel (1-ER-8), quoting cases like *Palmer v. Valdez*, 560 F.3d 965, 970 (9th Cir. 2009), and *Nwandu v. Bach*, 513 F.App'x 642, 644–45 (9th Cir. 2013).

## H.    Verdict and Appeal

After just one hour and 25 minutes of deliberations, the jury returned a unanimous defense verdict, finding no liability against any of the defendants. 3-ER-

404–408; 4-ER-432–435. The court entered the judgment for Defendants, (1-ER-2-3), and Mr. Ewalan timely appealed. 6-ER-822–871.

## SUMMARY OF THE ARGUMENT

The district court abused its discretion in denying substitute counsel to Mr. Ewalan. Under *Wilborn v. Escalderon*, courts must assess both the plaintiff's likelihood of success on the merits and the plaintiff's ability to articulate their claims in light of the legal complexity. 789 F.2d at 1331. These two factors must be considered together, and the failure to address either is reversible error. Here, the court initially found that both factors supported appointing counsel—Mr. Ewalan's claims survived summary judgment, and his brain injury made self-representation impractical in a legally and factually complex case. Yet, when he requested replacement counsel, the court failed to revisit those findings and offered no reasoned explanation for its reversal. Instead, it relied on superficial observations and disagreements with prior counsel, overlooking the very impairments and complexities that had earlier justified the appointment.

I.      Mr. Ewalan's case presented both a plausible likelihood of success and extraordinary obstacles to self-representation. His claims survived summary judgment, he faced cognitive and emotional impairments stemming from a traumatic brain injury and PTSD, and he struggled to navigate the evidentiary and procedural

27

demands of trial. These barriers were compounded by the structural disadvantages of remote, video-based participation while incarcerated, leading to specific, documented prejudice at trial. The court's denial of substitute counsel ignored its prior findings and left Mr. Ewalan unable to meaningfully present his case.

II.     The Ninth Circuit's current standard for appointing counsel under 28 U.S.C. § 1915(e)(1) lacks grounding in the statute's text and creates structural barriers for pro se litigants with meritorious claims. Requiring a showing of both merit and exceptional circumstances imposes an irrational burden on those least able to meet it. Other circuits have adopted more flexible, holistic approaches that better reflect the realities of indigent civil litigation. While this panel is bound by *Wilborn*, this case highlights why the standard warrants clarification or reconsideration in a future case.

## STANDARD OF REVIEW

This Court reviews a district court's denial of counsel to indigent civil plaintiffs under 28 U.S.C. § 1915(e)(1) for an abuse of discretion. *Wilkerson v. Wheeler*, 772 F.3d 834, 838 (9th Cir. 2014) (citing *Wilborn,* 789 F.2d at 1331. A district court abuses its discretion when it rules in an irrational manner, *see Chang v. United States*, 327 F.3d 911, 925 (9th Cir. 2003), or bases its ruling on a clearly

28

erroneous assessment of evidence, *see Am. Beverage Ass'n v. City & Cty. of San Francisco*, 871 F.3d 884, 889 (9th Cir. 2017).

## ARGUMENT

## I.    Mr. Ewalan Should Have Been Appointed Counsel When Properly Applying the Factors Under *Wilborn*

Under 28 U.S.C. § 1915, indigent litigants may proceed in forma pauperis by submitting a financial affidavit demonstrating their inability to pay court fees. The statute also authorizes courts to "request an attorney to represent any person unable to afford counsel." § 1915(e)(1); *see Mallard v. U.S. Dist. Ct. for S. Dist. of Iowa*, 490 U.S. 296, 310 (1989) ("[T]he choice of whether to accept a court's request [under § 1915(e)(1)] rests with the attorney.").

In applying that provision, this Court has required litigants to show "exceptional circumstances" before counsel may be appointed—an additional hurdle beyond demonstrating financial eligibility. Under the standard articulated in *Wilborn*, courts consider both "the likelihood of success on the merits [and] the ability of the petitioner to articulate his claims pro se in light of the complexity of the legal issues involved." 789 F.2d at 1331 (citing *Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983)).

In *Wilborn*, this Court acknowledged the shaky foundation of this test: it rests on the extension of *Weller v. Dickson*, 314 F.2d 598 (9th Cir. 1963)—a case about

29

in forma pauperis status, not appointment of counsel—to cover pro bono counsel requests "without comment" in *United States v. Madden*, 352 F.2d 792 (9th Cir. 1965). 789 F.2d at 1331. As the panel noted, this approach has "serious doubts," yet remains the law in this Circuit. *Id.*

When the two factors from *Wilborn* are properly applied, the record in this case demonstrates that exceptional circumstances warranted the appointment of counsel for Mr. Ewalan. Both factors—likelihood of success on the merits and ability to articulate claims in light of the case's complexity—pointed toward the need for appointed counsel. Remand is therefore required. The district court abused its discretion by denying substitute counsel despite previously finding that Mr. Ewalan's brain injury and the complexity of the case warranted appointment. It failed to reassess the likelihood of success on the merits and gave no reasoned basis for abandoning its prior conclusion that extraordinary circumstances justified representation. Instead, it relied on superficial observations about Mr. Ewalan's demeanor and disagreements with prior counsel, without explaining how those factors negated the impairments and legal complexity it had earlier identified.

This case also underscores the need to revisit the *Wilborn* framework, which is not grounded in the text of 28 U.S.C. § 1915. The statute authorizes courts to "request an attorney to represent any person unable to afford counsel." It imposes

30

no requirement that litigants demonstrate "exceptional circumstances," let alone a showing on the merits plus a heightened inability to articulate their claims. The current test adds a rigid gloss that limits judicial discretion and disqualifies the very litigants most in need of counsel—those unable to establish merit precisely because they lack legal training or capacity. While this panel remains bound by *Wilborn*, the standard warrants reconsideration in a future case en banc.

### A.   Mr. Ewalan Showed a Sufficient Likelihood of Success on the Merits

The first *Wilborn* factor—whether the plaintiff's claims are likely to succeed on the merits—has never been in genuine dispute in this case. Courts in this Circuit routinely consider whether a pro se plaintiff has survived summary judgment as an indicator of a plausible likelihood of success. *See, e.g., Wright*, 443 F. App'x at 293 ("since we are reversing the district court's grant of summary judgment...there will be a trial, which would surely tax [plaintiff's] abilities."); *Latham v. Pollard*, No. 3:20-cv-02177, 2024 WL 3367529, at *1 (S.D. Cal. July 10, 2024) (noting that the likelihood of success on the merits increased after some claims survived summary judgment); *Ogan v. Spokane Cnty. Jail*, No. cv-06-317, 2008 WL 238608, at *1 (E.D. Wash. Jan. 28, 2008) (same). Here, the magistrate judge explicitly conditioned the appointment of counsel on Mr. Ewalan's ability to survive summary judgment, requiring him to defend his case alone until that stage. *See* 1-ER-21–24.

31

At the time the district court denied Mr. Ewalan's request for replacement counsel, summary judgment had been partially denied, and the case was proceeding toward trial. Indeed, in its prior order granting the appointment of counsel, the court itself acknowledged that Mr. Ewalan's survival at summary judgment demonstrated the plausibility of his claims. 1-ER-10–15. Nothing in the record before the court's subsequent order denying replacement counsel undermined that conclusion. When later denying replacement counsel, however, the district court addressed only Mr. Ewalan's ability to articulate his claims and entirely omitted any consideration of the likelihood of success on the merits. 1-ER-4–9. That error alone warrants reversal. *See Wright*, 443 F. App'x at 293 (failure to consider one of the *Wilborn* factors is reversible error).

### B.    Mr. Ewalan's Could Not Sufficiently Articulate His Claims

The second *Wilborn* factor, whether the plaintiff can adequately articulate his claims in light of the legal issues, *Wilborn*, 789 F.2d at 1331, must be considered in the full context of the pro se litigant's circumstances, including medical, cognitive, and practical barriers. Here, Mr. Ewalan's traumatic brain injury and PTSD, coupled with the significant structural hurdles he faced as an incarcerated, remote pro se litigant, left him unable to present his case effectively.

32

1. **Cognitive and Emotional Barriers Undermined Mr. Ewalan's Ability to Articulate His Claims**

Courts have consistently acknowledged that mental and physical health conditions—including traumatic brain injuries and PTSD—can severely limit a pro se plaintiff's ability to articulate claims and participate meaningfully at trial. *See Tilei v. McGuinness*, 642 F. App'x 719, 722 (9th Cir. 2016) (appointment of counsel necessary where "medical incapacity" rendered plaintiff unfit to litigate); *see also Jenkins v. Woodard*, 109 F.4th 242, 249 (4th Cir. 2024) (inmate's mental health diagnosis "diminish[ed] his ability to represent himself"); *Eagan v. Dempsey*, 987 F.3d 667, 682 (7th Cir. 2021) (psychological history should be considered for determining litigation competency); *Sanchez v. Chapman*, 352 F. App'x 955, 958 (5th Cir. 2009) (health conditions exacerbated limitations on pro se litigation abilities). As the Seventh Circuit has explained, appointment is warranted where a plaintiff is "incapable of summarizing the facts of his case" or "barely able to provide a sequential account of the alleged assault[s] by [inmates] or his subsequent complaints to prison authorities[.]" *Pruitt v. Mote*, 503 F.3d 647, 661 (7th Cir. 2007).

Mr. Ewalan's impairments were well-documented. Mr. Anderson testified about Mr. Ewalan's PTSD diagnosis, and ongoing symptoms such as nightmares, hypervigilance, and distressing memories. 3-ER-251. Mr. Ewalan testified that he suffers from ongoing headaches, anxiety, and difficulty sleeping. 2-ER-159, 179. He

33

described intrusive memories of his assault: "Ever since I was assaulted, I have problems sleeping, I have anxieties, and I deal with bad dreams whenever I recall the pictures of that assault and remember that day." 2-ER-179. These symptoms directly affected his ability to participate in the trial. During his own testimony, Mr. Ewalan broke down while viewing the photographs of the July 2017 assault and was unable to continue. 2-ER-146.

The Seventh Circuit has warned that even a plaintiff capable of writing "intelligible documents" may be unable to deliver "a quick, oral response in front of a jury." *Walker v. Price*, 900 F.3d 933, 940 (7th Cir. 2018). That distinction is critical here: Mr. Ewalan's written filings could not capture his capacity to testify live, cross-examine witnesses, or manage the demands of trial. *See also Wood v. Idaho Dep't of Corr.*, 391 F. Supp. 2d 852, 867 (D. Idaho 2005) (appointment appropriate where "sensitive nature" of claims raised competency concerns).

### 2. Complex Legal and Factual Issues Required Advocacy Beyond Mr. Ewalan's Abilities

Deliberate indifference claims are inherently complex, involving an "objective" component of serious harm and a "subjective" component of state-of-mind. *See Wilk v. Neven*, 956 F.3d 1143, 1147 (9th Cir. 2020); *Hampton v. California*, 83 F.4th 754, 766 (9th Cir. 2023). Courts have recognized that proving a defendant's subjective awareness of risk is "fact-intensive" and a "nuanced legal

34

issu[e]" requiring sophisticated advocacy. *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013); *Pruitt*, 503 F.3d at 664 (Rovner, J., concurring).

Courts routinely emphasize that "deliberate indifference claims are too complex for pro se litigants because they depend upon the subtle appreciation of legal causation and of the duties imposed upon state prison officials by the Eighth Amendment." *Merritt v. Faulkner*, 697 F.2d 761, 765 (7th Cir. 1983); *see Tilei*, 642 F. App'x at 722 (counsel warranted where claim turned on "complex medical questions"). Here, Mr. Ewalan's case required medical evidence to establish causation between the assaults and his traumatic brain injury—an inherently technical matter that the judge knew was at issue because it had been disputed at summary judgment. *See* 4-ER-476–493.

As courts have long recognized, "constitutional claims that involve the state of mind of the defendant, such as those involving deliberate indifference," are "especially difficult" for pro se litigants. *James v. Eli*, 889 F.3d 320, 327 (7th Cir. 2018); *Swofford v. Mandrell*, 969 F.2d 547, 552 (7th Cir. 1992) ("the case depended on witness credibility," and "counsel was important to ensuring that the truth is exposed"). Here, Mr. Ewalan's case presented precisely that challenge: a "swearing contest" between his own testimony and the Defendants' denials. *Pruitt*, 503 F.3d at

35

660. Without counsel to cross-examine, test credibility, and challenge the Defendants' narrative, Mr. Ewalan was at a severe disadvantage.

The complexity of the case was further heightened by the necessity of medical testimony to substantiate Mr. Ewalan's claim that his traumatic brain injury and resulting symptoms originated from the 2017 assault. Courts have noted that cases involving medical evidence elevate the inherent complexity of the case for pro se parties. *See Tai Huynh v. Callison*, 700 F. App'x 637, 639 (9th Cir. 2017) (pro se litigant "ha[d] little ability to articulate his claims without the benefit of counsel" regarding complex medical issues); *Tilei*, 642 F. App'x at 722 (attorney necessary where "claim will turn on complex medical questions" regarding causation); *see Santiago v. Walls*, 599 F.3d 749, 761 (7th Cir. 2010); *Ricks v. Khan*, 135 F.4th 296, 302–03 (5th Cir. 2025) (deliberate indifference "claims involve a complex medical condition and 'an extremely high' legal standard" warranting appointment of counsel).

Finally, the record demonstrates that Mr. Ewalan was prejudiced by his fundamental misunderstanding of his claims, the parameters of admissible evidence, and the different stages of trial. Courts have held that in such a situation where the litigant has an insufficient grasp of the legal issues involved or is unable to state the factual bases of the claims that exceptional circumstances exist to appoint counsel.

36

*See Agyeman v. Corr. Corp. of Am.*, 390 F.3d 1101, 1103–04 (9th Cir. 2004) (requiring appointment of counsel where a case was complex due to case law as well as litigant's personal circumstances). At trial, Mr. Ewalan demonstrated that he did not understand the basic structure of his section 1983 civil claims and mistakenly believed he was prosecuting criminal claims. *See* 3-ER-279 (court explaining "There is no Count 2. This isn't a criminal case where there was a Count 1 or a Count 2. This is a civil case in which there may be multiple theories, but it happens that the theory, in regards to all defendants, is the same 1983 claim.").

### 3. Structural Barriers Further Impeded Mr. Ewalan's Ability to Articulate His Claims

Beyond medical and legal complexity, structural barriers inherent in Mr. Ewalan's incarceration and remote participation compounded his challenges. Courts have recognized that video proceedings can impair a factfinder's ability to assess credibility: "video conferencing 'may render it difficult for a factfinder in adjudicative proceedings to make credibility determinations and to gauge demeanor,' and may thereby violate due process." *Vilchez v. Holder*, 682 F.3d 1195, 1199 (9th Cir. 2012) (citation omitted); *see also Walker*, 900 F.3d at 939 (video trial "would make it harder to effectively try a case that rested almost exclusively on credibility issues," because the plaintiff would have to "compensate for the loss of the physical presence of the parties, the witnesses, the jurors, and the judge," with

37

screens limiting the jury's ability to "observe body language" and "non-verbal cues").

Mr. Ewalan's trial was riddled with communication breakdowns: at least twenty-one times during his closing argument, the transcript noted that Mr. Ewalan was "inaudible." *See, e.g.*, 3-ER-377. A juror admitted they "didn't understand hardly a word" Mr. Ewalan said, citing his accent and the inability to read his lips. 2-ER-49–50. Even the court acknowledged that the jury could not properly see Mr. Ewalan until his closing argument, when the video feed was finally adjusted. *See* 3-ER-356.

The problem extended to Mr. Ewalan's presentation of evidence. Mr. Ewalan was forced to rely on the Defendants to identify and present key exhibits. For instance, they introduced prior diary entries but did not present crucial color photographs of the assault. Mr. Ewalan protested: "[T]his needs to be displayed a color photograph, Your Honor, so the jury can be able to see the injuries. They can't see them in a black-and-white photo. We have colored photos, Your Honor." 2-ER-142–143. The lack of control over his own evidence, coupled with limited access to exhibits during the trial, severely hindered Mr. Ewalan's ability to advocate for himself.

Courts have recognized that these obstacles matter. As the Eighth Circuit put it, "the absence of counsel will more likely have a prejudicial impact on the minds of jurors" because, unlike a bench trial, a jury trial does not afford special protections for pro se litigants. *Abdullah v. Gunter*, 949 F.2d 1032, 1036 (8th Cir. 1991). Without an advocate to navigate trial, Mr. Ewalan's ability to articulate his claims was fundamentally compromised.

### 4. The District Court's Denial of Replacement Counsel Ignored Its Own Prior Findings and Inconsistently Applied the Standard, Resulting in Prejudicial Error

Despite previously recognizing that Mr. Ewalan's cognitive impairments and the complexity of his case warranted appointment of counsel, the district court later reversed course. In its conditional grant of counsel, the court found that "extraordinary circumstances support the appointment of counsel in this case," specifically citing the "impacts of Mr. Ewalan's brain injury" and the legal questions to be resolved at trial. 1-ER-14. Yet when Mr. Ewalan later requested replacement counsel, the court dismissed those same concerns, suggesting that his disagreements with prior counsel showed he was confident in handling his case, and pointing to his survival at summary judgment as proof he could litigate on his own. 1-ER-7–8. The court stated that it could not assess the likelihood of success on the merits (a required *Wilborn* factor) and denied counsel, despite having previously concluded that Mr.

Ewalan's survival at summary judgment was sufficient to show a likelihood of success on the merits. The court offered no explanation for how that conclusion had changed. 1-ER-7.

Prejudice is evident where a litigant struggles with the basic demands of trial, including introducing evidence, questioning witnesses, and complying with evidentiary rules. *See, e.g., Walker*, 900 F.3d at 939. Here, the record demonstrates that Mr. Ewalan's inability to articulate his claims at trial caused specific, concrete prejudice. He did not understand that his opening statement was not evidence. *See* 3-ER-276. He failed to admit key exhibits, including medical records and diaries documenting threats, because he could not overcome foundational and hearsay objections. *See* 3-ER-251, 278. He rested his case believing he could later introduce evidence, which led to the Rule 50(a) dismissal of his 2019 assault claims. *See* 2-ER-182. And he lacked an expert witness necessary to establish causation, a requirement the court itself recognized as critical. *See* 2-ER-156–157.

A lawyer would have addressed each of these gaps: ensuring that Mr. Ewalan's testimony was presented in an organized, coherent manner, without the frequent interruptions and confusion that undermined the clarity of his case; properly laying the foundation to admit key evidence such as medical records, diary entries, and photographs; retaining and presenting expert testimony to establish the causal

40

link between the 2017 assault and Mr. Ewalan's traumatic brain injury; and effectively cross-examining the Defendants to challenge their credibility and underscore their failure to act on known threats. An attorney would also have helped ensure Mr. Ewalan's case was presented with the same procedural care as the Defendants'—who, at the instruction of the court, managed the introduction of evidence and trial logistics as the judge's de facto courtroom lieutenant. Counsel would have ensured that Mr. Ewalan's remote video testimony was supported by clear audio, properly introduced exhibits, and effective courtroom advocacy. Finally, an attorney would have helped Mr. Ewalan avoid critical errors such as resting his case prematurely, which prevented him from introducing essential evidence regarding the circumstances surrounding the 2019 assault. Without counsel, these failures left Mr. Ewalan unable to fully present his case to the jury.

### C. The Ninth Circuit's Standard Warrants Clarification or Reconsideration

The panel, of course, is bound by Circuit precedent. But the panel should recognize that the Ninth Circuit's approach to the appointment of pro bono counsel stands on the wrong side of a clear circuit split. The Ninth Circuit's test—requiring a pro se litigant to establish both a likelihood of success on the merits and exceptional circumstances—has no basis in the text of the statute. *See Tabron v. Grace*, 6 F.3d 147, 155 (3d Cir. 1993) ("Nothing in this clear language suggests that appointment

41

is permissible only in some limited set of circumstances."). The court's sister circuits have criticized this unduly stringent, atextual standard. *See Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986) (describing the Ninth Circuit's approach as "stringent"). This Court itself has acknowledged the shortcomings of the *Wilborn* test, noting its "incoherence" and inherent contradictions:

> We feel compelled to remark that we are troubled by what we perceive to be the incoherence of the two-pronged inquiry into exceptional circumstances *by which we are bound*. The present case aside, we question how a court reasonably can expect a strong showing by a § 1983 claimant on the first prong when it is manifestly unlikely that a *pro se* petitioner involved in a complex case which he cannot litigate effectively would be *capable* of demonstrating a likelihood of success on the merits. *Despite our misgivings, we are bound by the law of this circuit.*

*Wilborn*, 789 F.2d at 1332 (emphasis added).

The district court's reasoning revealed a fundamental tension in the *Wilborn* standard. The magistrate judge equated "likelihood of success on the merits" with prevailing on summary judgment—requiring Mr. Ewalan to advance past summary judgment without a lawyer to demonstrate that he deserved one. 1-ER-24. Yet when Mr. Ewalan did so, the district court used that very success as a reason to deny him counsel, citing it as evidence that he was capable of proceeding pro se. 1-ER-8.

Other circuits' approaches to the appointment of pro bono civil counsel help mitigate this tension. The Fifth, Sixth, and Seventh Circuits do not require district courts to consider the plaintiff's likelihood of success on the merits. *See e.g., Branch*

42

*v. Cole*, 686 F.2d 264 (5th Cir. 1982); *Lavado v. Keohane*, 992 F.2d 601 (6th Cir. 1993); *Pruitt*, 503 F.3d 647. And even though the Second, Third, Eighth, and D.C. Circuits require courts to assess the potential merit of the plaintiff's claims, they also instruct district courts to consider a variety of other factors. *See e.g.*, *Hodge*, 802 F.d at 61–62 (district court should "consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.); *Tabron v. Grace*, 6 F.3d at 155–56 (requiring courts to consider factors such as "the plaintiff's education, literacy, prior work experience, [] prior litigation experience," "ability to understand English," or "the restraints placed upon [a prisoner] by confinement."); *Rayes v. Johnson*, 969 F.2d 700, 703 (8th Cir. 1992) ("The inquiry regarding the plaintiff's need should focus on several factors, including the likelihood that the plaintiff and the court will benefit from the assistance of counsel, the factual complexity of the case, the plaintiff's ability to investigate the facts and present his claim, the existence of conflicting testimony, and the complexity of the legal issues.") (internal citations omitted).

This flexible approach is particularly important for incarcerated *pro se* litigants,[3] who may "lack ready access to a law library," are "unclear about [their] right[s] to obtain certain records," and are "hampered by the restraints of the institution as well as by [their] own lack of legal knowledge." *Rayes*, 969 F.2d at 704. This approach "suggest[s] that many, if not most, prisoner cases could be considered sufficiently complex in light of the inherent mental, educational, and physical limitations and barriers most prisoners face." *Cole v. Janssen Pharms, Inc.*, 265 F. Supp. 3d 892, 898 (E.D. Wis. 2017). This is particularly true when the prisoner is bringing a complaint against the prison or its employees. *See e.g.*, *Parker v. Carpenter*, 978 F.2d 190, 193 (5th Cir. 1992) ("Appellant is a prisoner who, without counsel, would have to investigate by himself the prison's policies and employees of the very jail where he is incarcerated."); *Duncan v. Duckworth*, 644 F.2d 653, 656 (7th Cir. 1981) ("As a pro se inmate of a state prison, Duncan is at a distinct disadvantage in trying to discover the identity of those who were directly responsible for the delay in his treatment. This difficulty should not be used to prevent him from seeking relief on an otherwise meritorious claim.")

---

[3] *See generally*, Kimberly A. Owens, *Right to Counsel – The Third Circuit Delivers Indigent Civil Litigants from Exceptional Circumstances*, 39 Vill. L. Rev. 1163 (1994); Howard B. Eisenberg, *Rethinking Prisoner Civil Rights Cases and the Provision of Counsel*, 7 S. Ill. U. L.J. 417 (1993).

44

To the extent there are concerns about administrability or overuse, experience from other circuits makes clear that a more flexible standard can be applied without overwhelming courts or exhausting the pro bono bar. Moreover, 28 U.S.C. § 1915(e)(1) already guards against any risk of overextension by giving courts the discretion to request—not require—an attorney to represent an indigent litigant. *See Mallard v. U.S. Dist. Court for S. Dist. of Iowa*, 490 U.S. 296, 310 (1989) (holding that courts may request, but not compel, attorneys to represent indigent civil litigants).

If this Court chooses to follow the example of the Second, Third, Eighth, and DC Circuits, it may require district courts to first evaluate the merits of a prisoner's claim but then consider a variety of holistic factors to determine whether pro bono counsel should be appointed.

This case reflects the very concerns that *Wilborn* anticipated nearly four decades ago. The standard it announced continues to pose challenges for district courts and litigants alike, particularly in cases involving incarcerated plaintiffs facing significant structural and cognitive barriers. Without clearer guidance or a more comprehensive framework, deserving litigants may continue to fall through the cracks—not for lack of merit, but for lack of ability to demonstrate it. While this

panel is bound by existing precedent, it may be appropriate to acknowledge that the current standard invites reconsideration in a future case.

## CONCLUSION

For the foregoing reasons, Mr. Ewalan respectfully requests that this Court vacate the judgment and remand to the District Court with instructions to appoint pro bono counsel to Mr. Ewalan in advance of a new trial.

Date: June 10, 2025

K&L GATES LLP

By: */s/ Tre A. Holloway*
Tre A. Holloway

By: */s/ Neeki Memarzadeh*
Neeki Memarzadeh

By: */s/ Michael J. Stortz*
Michael J. Stortz

By: */s/ Taylor Yamahata*
Taylor Yamahata

*Attorneys for Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-2918

I am the attorney or self-represented party.

This brief contains 12099 words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☒ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated _____.

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _/s/ Tre A. Holloway_____ **Date:** _June 10, 2025_____
*(use "s/[typed name]" to sign electronically-filed documents)*

# STATUTORY ADDENDUM

28 U.S.C. § 1915

§ 1915. Proceedings in forma pauperis

**(a)(1)** Subject to subsection (b), any court of the United States may authorize the commencement, prosecution or defense of any suit, action or proceeding, civil or criminal, or appeal therein, without prepayment of fees or security therefor, by a person who submits an affidavit that includes a statement of all assets such prisoner possesses that the person is unable to pay such fees or give security therefor. Such affidavit shall state the nature of the action, defense or appeal and affiant's belief that the person is entitled to redress.

**(2)** A prisoner seeking to bring a civil action or appeal a judgment in a civil action or proceeding without prepayment of fees or security therefor, in addition to filing the affidavit filed under paragraph (1), shall submit a certified copy of the trust fund account statement (or institutional equivalent) for the prisoner for the 6-month period immediately preceding the filing of the complaint or notice of appeal, obtained from the appropriate official of each prison at which the prisoner is or was confined.

**(3)** An appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith.

**(b)(1)** Notwithstanding subsection (a), if a prisoner brings a civil action or files an appeal in forma pauperis, the prisoner shall be required to pay the full amount of a filing fee. The court shall assess and, when funds exist, collect, as a partial payment of any court fees required by law, an initial partial filing fee of 20 percent of the greater of--

**(A)** the average monthly deposits to the prisoner's account; or

**(B)** the average monthly balance in the prisoner's account for the 6-month period immediately preceding the filing of the complaint or notice of appeal.

**(2)** After payment of the initial partial filing fee, the prisoner shall be required to make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account. The agency having custody of the prisoner shall forward payments from the prisoner's account to the clerk of the court each time the amount in the account exceeds $10 until the filing fees are paid.

**(3)** In no event shall the filing fee collected exceed the amount of fees permitted by statute for the commencement of a civil action or an appeal of a civil action or criminal judgment.

**(4)** In no event shall a prisoner be prohibited from bringing a civil action or appealing a civil or criminal judgment for the reason that the prisoner has no assets and no means by which to pay the initial partial filing fee.

**(c)** Upon the filing of an affidavit in accordance with subsections (a) and (b) and the prepayment of any partial filing fee as may be required under subsection (b), the court may direct payment by the United States of the expenses of (1) printing the record on appeal in any civil or criminal case, if such printing is required by the appellate court; (2) preparing a transcript of proceedings before a United States magistrate judge in any civil or criminal case, if such transcript is required by the district court, in the case of proceedings conducted under section 636(b) of this title or under section 3401(b) of title 18, United States Code; and (3) printing the record on appeal if such printing is required by the appellate court, in the case of proceedings conducted pursuant to section 636(c) of this title. Such expenses shall be paid when authorized by the Director of the Administrative Office of the United States Courts.

**(d)** The officers of the court shall issue and serve all process, and perform all duties in such cases. Witnesses shall attend as in other cases, and the same remedies shall be available as are provided for by law in other cases.

**(e)(1)** The court may request an attorney to represent any person unable to afford counsel.

**(2)** Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that--

**(A)** the allegation of poverty is untrue; or

**(B)** the action or appeal--

**(i)** is frivolous or malicious;

**(ii)** fails to state a claim on which relief may be granted; or

**(iii)** seeks monetary relief against a defendant who is immune from such relief.

**(f)(1)** Judgment may be rendered for costs at the conclusion of the suit or action as in other proceedings, but the United States shall not be liable for any of the costs thus incurred. If the United States has paid the cost of a stenographic transcript or printed record for the prevailing party, the same shall be taxed in favor of the United States.

**(2)(A)** If the judgment against a prisoner includes the payment of costs under this subsection, the prisoner shall be required to pay the full amount of the costs ordered.

**(B)** The prisoner shall be required to make payments for costs under this subsection in the same manner as is provided for filing fees under subsection (a)(2).

**(C)** In no event shall the costs collected exceed the amount of the costs ordered by the court.

**(g)** In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

**(h)** As used in this section, the term "prisoner" means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.